IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| IVAN "KEITH" GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:14cv592-MHT |
| | ) | (WO) |
| CITY OF DOTHAN, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

Plaintiff Ivan "Keith" Gray, a former captain of
the Dothan Police Department, asserts that his
employer, defendant City of Dothan, Alabama,
discriminated against him on the basis of his race and
retaliated against him for attempting to remedy that
discrimination, both in violation of Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C.
§§ 1981a and 2000e through 2000e-17; that the city
violated his First Amendment right of association, as
enforced through 42 U.S.C. § 1983; and that the city
violated a consent decree prohibiting race

1

discrimination in the City of Dothan.  This court has original jurisdiction over his claims pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

The case is now before this court on the city's motions for summary judgment.  For the reasons below, summary judgment will be entered in favor of the city only in part.


## I.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in favor of that party.  <u>Matsushita Elec. Indus. Co.
Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

Gray, an American of African descent, served in the
Dothan Police Department for 28 years.  At the time he
was terminated, he had risen to the third-highest rank
in the department, captain, and he was the only black
sworn police supervisor on the force.  The department
itself employed only 15 black sworn officers out of a
total of 165.  (Notably, in 2010, the population of
Dothan was 32.5 % black.  <u>See</u> United States Census,
2010        Demographic        Profile        Data,
http://factfinder.census.gov/faces/tableservices/jsf/pa
ges/productview.xhtml?src=bkmk.)

Gray also rides motorcycles.  In 2008, he formed

Bama Boyz Motorcycle Club, a predominantly black

motorcycle club in Dothan.  As its first president, he

managed the club and its affairs, which included

recruiting members; maintaining peaceful relations with

other area motorcycle clubs; and organizing social

events and charity runs.  One charity run raised money

for the Dothan Police Athletic League, and the police

chief accepted payment on the league's behalf.  Several

other Dothan police officers, black and white, were

3

members of different area motorcycle clubs, but they were not part of Bama Boyz.

Gray describes a history of race discrimination dating back to his first days on the force. Though he applied to be a police officer, he was hired in 1985 as a jail-security officer, a less prestigious position. He was placed on a registry of candidates for an officer position, but when his name was next on the registry to be promoted to officer, the police chief abandoned the registry system. He complained to the police chief at the time, threatening suit. He was eventually promoted later that year. In 1988, he was denied the opportunity to take the corporal exam because he had not accumulated enough service years, but three white officers with the same amount of experience were permitted to take the exam. He filed a lawsuit in state court to allow him to take the exam; he won the suit; and he was promoted.

4

Gray continued to be denied promotional and training opportunities throughout his police career. Several times, qualifications for promotions were changed and meritless internal investigations were initiated to allow the department to promote white candidates over him; on other occasions, white candidates were scored higher than he on subjective portions of civil-service promotional exams. He repeatedly requested training that white officers had received and that had enabled their career advances, but he was denied. Gray complained formally and informally about race discrimination throughout his career, including filing two charges with the Equal Employment Opportunity Commission (EEOC) and the filing of a state-court lawsuit.

Frustrated with what he perceived to be race discrimination in scoring on promotional exams, Gray complained about the testing method. In 2006, the city agreed to implement an external assessment center in an

attempt to make the exam more objective; Gray contends that, by then, other white officers had advanced in their careers at a rate faster than he had.

After the assessment center was in place, Gray once tied with a white officer for a promotion to lieutenant. The day the tied score was announced, the city placed Gray under an internal-affairs investigation for alleged misconduct. Gray successfully fought the allegations and received the promotion, becoming the first and only black lieutenant on the Dothan force. (Prior to Gray, the city had posthumously promoted another black officer to Lieutenant.) He believes that he had been targeted with these allegations because of his race.

Throughout his employment, Gray was denied numerous training opportunities that were offered to white officers, and, as a result, he was passed over for other promotional opportunities. For example, he requested to attend the FBI National Academy, but was

never selected.  This program was added as a "preferred qualification" for the Chief of Police position when the position was posted in 2009; the candidate ultimately selected for the position, Gregory Benton, a white officer, had attended the program.  Prior to 2009, the only listed "preferred qualification" for Chief of Police had been a Master's Degree, which Gray had obtained, but Benton had not.

Gray contends that racially hostile attitudes of his fellow officers permeated the department.  First, racial slurs were directed at him and used around him. Gray was called the "nigger" himself by white officers, and he heard the word used by white superiors.  On one occasion, he and his white supervisor were patrolling for a young black juvenile; his supervisor remarked, while passing a convenience store, "There ain't no Niggers over there."  Gray Declaration (doc no. 48-1) at 4.  Another time, a white officer referred to his patrol area as the "poor black trash part of town."

<u>Id</u>.  Once,  when  exchanging  money  with  a  white  officer
on  a  public  corner,  the  officer  said  to  him,  "People
aren't  going  to  know  what  to  think  with  a  nigger  giving
a  white  man  money."   Gray  Deposition  (doc.  no.  34-3)  at
110.   Gray  also  recounts  several  uses  of  the  slur  by
officers  away  from  his  presence;  he  became  aware  of
these  incidents  through  the  internal  investigations
that  they  sparked.   He  also  contends  that  superior
officers  developed  code  words  to  refer  to  people  of
different  races.

   Several  officers  were  affiliated  with  organizations
and  viewpoints  that  Gray  considered  racially  offensive.
For  example,  Gray's  direct  supervisor  at  the  time  of
his  termination,  Steve  Parrish,  was  once  a  member  of
the  Sons  of  Confederate  Veterans,  a  group  dedicated  to
memorializing  the  history  and  values  of  the  Southern
Confederacy.[1]   Parrish  named  his  son  after  Nathan

_____

   1.  Gray  has  submitted  evidence  explaining  that
there  is  an  ongoing  debate  among  members  of  the  Sons  of
Confederate  Veterans  as  to  whether  the  focus  of  the

Bedford Forrest, a confederate general and first national leader and "Grand Wizard" of the Ku Klux Klan; Parrish's office was decorated with confederate memorabilia. Several other city police officers were members of the Sons of Confederate Veterans, including the officer who replaced Gray after his termination. Gray complained about Parrish's association with the group in an internal race-discrimination complaint described below.

Gray also witnessed other racially offensive private behavior from his fellow officers. For example, he once viewed a picture on Officer Michael Woodside's Facebook page depicting the partially charred face of President Obama and derogatory comments about the President. Moreover, Gray submitted a

---

organization should be a history or genealogy club, or to promote racial extremism. In any case, it is clear that representatives of the group have organized events supporting the values of the Confederacy and its associations with slavery and apartheid enforced by violence.

picture of eleven white men--nine of whom are current or former officers on the city police force, including Parrish and Gray's replacement--posing behind a large Confederate flag, and he avers that this photo was widely circulated within the Department.

Parrish became Gray's supervisor in 2010. Over the next four years, he scrutinized and nitpicked Gray's performance; gave more deference and respect to white officers and command staff than to Gray; and attempted to embarrass Gray and defame his character. For example, Parrish accused Gray of "micromanaging" officers under his command; publicly questioned Gray's whereabouts on work days; chastised Gray for delays in paperwork and reports; lodged critical reviews of Gray on an internal-communications system; and wrote positive reviews for white officers while failing to make favorable entries for Gray when they were deserved.

In February 2012, Gray was put under three separate internal-affairs investigations. One of those investigations stemmed from assistance he gave to a black dispatcher-trainee in filing a race-discrimination complaint; another was due to an incident that arose at a nightclub between Gray and another officer in Gray's off-duty hours; and the third had to do with counseling he had given to an inferior officer. Gray was put on a "performance improvement plan," which he felt demeaned and undermined his character. In May 2012, he complained to Chief Benton that Parrish's treatment and the performance plan were based on race. Gray was removed from the performance plan the next day.

In December 2012, Gray complained about the city's targeting and treatment of minority citizens--specifically, an arrest of two young black men, an arrest that Gray believed to be illegal, based on trumped up charges, and discriminatory. Parrish

11

discouraged Gray from investigating the matter and told him to "move on." Not long after these complaints, Gray was reassigned from Field Operations Bureau to Administrative Services Bureau, a lower-status position with less supervisory authority, though with the same pay and at the same rank. Parrish posted Gray's transfer publicly in the Police Department office, which Gray contends was both unusual and humiliating. Gray complained directly to Parrish about the transfer; Parrish, in turn, reported to Chief Benton that Gray had made a "faintly veiled discrimination claim." January 23, 2013 Internal Memo (doc. no. 40-11) at 29. Gray also complained to the department's Equal Employment Opportunity (EEO) Officer Darryl Matthews, but was told that his complaint would have to wait until another race-discrimination allegation lodged by another officer had been resolved.

In May 2013, the department removed Gray's supervisory authority by creating a new position and

12

placing a lower-ranked white officer, Michael Etress, between Gray and the staff he commanded. Gray previously had directly supervised 60 employees; he now supervised only two: Etress and the Police Department's only black secretary. Parrish continued to scrutinize Gray's supervision of Etress. He warned Gray that he was "watching" him, and he accused Gray of "micromanaging" Etress. Gray Declaration (doc. no. 48-1) at 7.

In June 2013, Gray filed a complaint on the internal-communications system in response to a critical review he had received from Parrish. His complaint alleged race discrimination by Parrish; accused Parrish of treating white officers more favorably; requested to be removed from Parrish's supervision due to his affiliation with the Sons of Confederate Veterans; and notified his supervisors that he planned to file EEOC charges. The next day, Gray brought his complaint to Delvick McCay, the Personnel

13

Board Director; after requests from McCay, Parrish, and Chief Benton, EEO Officer Mathews began an investigation.  While this investigation was pending, Gray filed a charge of race discrimination with the EEOC on August 2, 2013, which was amended on October 4 to add a charge of retaliation.[2]

EEO Officer Mathews's internal-investigation report was released a few days before Gray was terminated. Mathews determined that Gray's allegations of race discrimination were unsubstantiated.  He also reported that the Sons of Confederate Veterans group was not a racist organization, relying on his finding that the group is not listed as a hate group by the Southern Poverty Law Center, though Gray has submitted evidence

_____

2.  It is unclear from the record when Gray's individual supervisors found out that he had filed these charges, though, they had been on notice for several weeks that he intended to file such charges. However, it is certain that, by the time of his first internal-affairs interview in late August 2013, all relevant officers knew of the charges, because he accused his interviewers of retaliation during that interview. Gray's accusation was included in the investigative report for two to Chief Benton

that the group has been tracked by the Southern Poverty Law Center's "Hate Watch" blog for its sponsorship of various pro-Confederacy events and causes.

Three weeks after Gray filed his EEOC charge, Officers Parrish and Woodside responded to an assault at a clubhouse run by the local chapter of a black motorcycle club, Outcast. Outcast was known to be an "outlaw" organization, a term used to describe motorcycle clubs that operate as conduits for criminal enterprise--for example, to traffic drugs or commit violence. The parties dispute whether Outcast is also a "one-percenter" club, that is, a group of motorcyclists who identify as law-breakers. The term "one-percenter" is "derived from an American Motorcycle Association official's remark in the 1950s that 99 percent of all bikers were law-abiding, and thus 'only' one percent of the motorcycles on the roads belonged to persons who were trouble-makers." <u>Piscottano v. Murphy</u>, 511 F.3d 247, 255 (2d Cir. 2007).

15

At the clubhouse, Woodside questioned a local firefighter and affiliate of Outcast, Willie McGuire. Woodside asked McGuire whether he knew any other firefighters or police officers involved with Outcast. Woodside specifically described Gray and asked if McGuire had seen him around.

McGuire stated that he had seen Gray at several charity events and that Gray's group, the Bama Boyz, sometimes hung around Outcast events, though the Bama Boyz were not formally affiliated with Outcast. McGuire also reported that another Dothan officer was a member of a different black motorcycle club that was an official "support" group for Outcast.

Six Outcast members were brought back to the station for questioning regarding the extent of Gray's and the other officer's association with their group. Gray contends that these suspects were offered lenience in their criminal charges in exchange for providing

16

information about Gray's involvement with their motorcycle club.

The chapter president reported that he had once asked Gray whether the Dothan Police Department was investigating Outcast.  Gray denied any investigation, but the president explained that he knew Gray was lying because a different black officer had told him otherwise.  The president also told the police that Bama Boyz fell under the "guidance" of Outcast.  Other members reported they had seen Gray around the Outcast clubhouse during various functions, and some stated that they had seen Gray in the presence of marijuana, though none had seen him smoking.  At least two of these members had criminal records.

Later that evening, Gray was brought into the police department for questioning.  Gray admitted that Bama Boyz had a "blessing" from Outcast, which meant that the group could ride in Outcast's territory without being harassed, but he denied that there were

strings attached to the blessing or that the two groups were formally affiliated. Gray also stated that he sought other blessings from other outlaw clubs when he opened up another branch of the Bama Boyz in Anniston, Alabama. Gray admitted that he had been to the Outcast clubhouse on occasion for social events, and he identified himself in a photograph standing alongside Outcast members.

After this interview, the police department placed Gray on paid administrative leave for four weeks while it investigated the allegations. Gray reports that, throughout his 28-year career, he had never known of such a long internal-affairs investigation. Most investigations, he reports, last for about a week or less. While on leave, Gray was questioned once more for over five hours. He contends that both interviews resembled criminal interrogations more than an internal-affairs investigations. For example, the questioning officers wore their firearms during the

interview, in violation of departmental policy and despite the "firearm dropbox" kept outside the interrogation room.

Through the investigation, the Police Department learned several other things about Gray that it ultimately used to bolster the basis for his termination. First, the department asserted that Gray's city-issued cell phone had been used to access pornography. The cell phone has been the subject of much discovery litigation before the magistrate judge, and Gray vehemently denies the credibility of the city's allegation. However, the city failed to preserve the cell phone, so Gray could not conduct independent forensic testing of the phone.

Second, the department determined that Gray had used the police database to access the personal information of other officers for non-work-related reasons.

Finally, it determined that Gray had been evasive during his internal-affairs interviews.

The investigation concluded in mid-September. The Police Department determined that Gray was associated with the Outcast motorcycle club and submitted its report to Chief Benton. After receiving the report, Benton decided to terminate Gray.[3] Though Gray's notice of termination cited several policy violations behind his discharge, the primary reason for Gray's termination, according to Benton, was his association with outlaw motorcycle groups. This was "conduct unbecoming of an officer," which the department classified as an "intolerable offense."

Gray appealed his termination to the personnel board, made up of both black and white members, and the board unanimously upheld the decision to terminate. Gray was replaced by Carlton Ott, a white male. Gray then brought this lawsuit.

_____

3. Gray was offered the opportunity to resign, but he declined.

## III.  DISCUSSION

Gray  asserts  claims  of  race  discrimination  and
retaliation in violation of Title VII; violation of his
First   Amendment   right   to   free   association;   and
violation of a longstanding consent decree against the
City of Dothan.   The court will discuss each claim in
turn.

### A. Title VII Claims

#### 1. Timeliness

Gray  asserts  three  types  of  Title  VII  claims
against the City: discrete acts of race discrimination;
a  racially  hostile-work  environment;  and  a  retaliatory
hostile-work  environment.   Gray  makes  two  discrete
claims  of  race  discrimination:  the  first  is  based  on
the  transfer  of  his  supervisory  authority  in  May  2013;
and  the  second is based on his termination in September
2013.   He  also  claims  that  he  was  subject  to  racial

21

harassment throughout his career, which began in 1985, and that a retaliatory work environment following his complaints in December 2012 and through his termination the next fall.

In describing these claims, Gray chronicles a long history of alleged discrimination, which the city argues is irrelevant because the history recounts allegedly discriminatory conduct that would be untimely--and thus not actionable--if brought as discrete claims of discrimination.

Under Title VII, a party may not sue on discrete discriminatory acts that occurred more than 180 days before the EEOC charge was filed. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). But discriminatory conduct that is outside the statute-of-limitations period is not necessarily barred from the court's consideration as background evidence for other timely discrete claims. Id. at 113. Nor is such conduct necessarily barred from the court's

consideration of a hostile-environment claim, if the plaintiff can establish that the untimely discrimination was part of the same pattern of intimidation, ridicule, and insult that continued into the statutory period and cumulatively produced a hostile environment. See id. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). Thus, to the extent that any untimely acts contribute to a timely hostile-environment claim, they too may be considered for that purpose. See id. at 118 ("The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability."); Gowski v. Peake, 682 F.3d 1299, 1313 (11th Cir. 2012) (explaining that a jury can consider discrete acts as part of a hostile-environment claim); cf. Chambless v.

23

**Louisiana-Pac. Corp.**, 481 F.3d 1345, 1349-50 (11th Cir. 2007) ("Where the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely, non-discrete acts that are part of the same claim.").

The reasoning behind the city's argument seems to be that when an act of discrimination is offensive enough to rise to the level of actionability, it needs to be addressed promptly.  In other words, the Title VII statute of limitations--and the EEOC administrative process it promotes--operate prophylactically, as an incentive to remedy discrimination in the workplace before it gets any worse.  Filing an EEOC charge long after the violation has ended prevents the EEOC from doing its job.

But the city's argument ignores the fundamental way that a hostile-environment claim is different from a claim based on a discrete act of discrimination: the

24

illegal    workplace    practice    sued    upon    in    a
hostile-environment  claim  is  the  hostile  <u>environment</u>
that  arose  from  an  accumulation  of  many  acts--not  any
particular  act  itself.   It  does  not  follow,  therefore,
that  the  most  compelling  evidence  of  the  existence  such
an  environment  should  not  be  considered  by  this  court
merely  because  the  act  was  egregious  enough  on  its  own
to  have  been  a  basis  for  suit.   Moreover,  perhaps  a
plaintiff  waited  to  file  his  EEOC  charge  because  he
wanted  to  see  if  things  would  get  better  before
ruffling  feathers  with  management;  or  perhaps  he  was
not  sure  if  any  particular  act  was  offensive  enough.
Whatever  might  have  been  the  reason  to  wait,  if  the
plaintiff  can  establish  the  existence  of  a  hostile-work
environment  within  the  limitations  period,  the  court
will  not  ignore  the  evidence  of  untimely  acts  of
discrimination  merely  because  they  might  have  been
sufficient  for  liability  as  "discrete"  acts.

Therefore, while any discrete acts of discrimination occurring more than 180 days before Gray filed his EEOC charge on August 2, 2013, are not actionable as separate claims, the court will nonetheless consider them as background evidence for Gray's timely discrete claims of discrimination, as well as evidence of racial harassment and a retaliatory hostile-work environment.

## 2. Discrimination

Gray contends that two discrete acts of discrimination are timely Title VII claims: the transfer of his direct supervisory authority to Etress in May 2013, and his unlawful termination.

### a. Transfer of Supervisory Authority

A few months after Gray was transferred to the Administrative Services Bureau, a new supervisory position was created below him, and Lieutenant Etress

26

assumed direct supervision over Gray's staff.[4]   Gray contends that this is a discrete act of discrimination.

For a discrete Title VII discrimination claim, an employee must demonstrate he suffered an adverse employment action--that is, either an "ultimate employment action" such as termination, failure to hire, or demotion, or "a serious and material change in the terms, conditions, or privileges of employment." Crawford v. Carroll, 529 F.3d 961, 970-71 (11th Cir. 2008) (emphasis in original) (internal quotation marks omitted), overturned on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); see also Wilborn v. S. Union State Cmty. Coll., 720 F. Supp. 2d 1274, 1301 (M.D. Ala. 2010) (Thompson, J.).

In this case, it could be argued that the creation of a new management position below Gray in the Administrative Services Bureau effectively removed much

_____

4. Gray concedes that the transfer to the Administrative Service Bureau falls outside of the statute of limitations, so that it may not be sued on as an individual claim.

of his supervisory authority, effectively resulting in a demotion for him.  However, the problem for a Gray is that his complaint does not assert this claim as a separate one; indeed, it was not apparent until his summary-judgment response that he intended to do so. Nor was the city on notice of it, because the city did not respond to such a claim in its filings.  Because the claim comes too late, summary judgment on it will be entered in favor of the city.

### b. Unlawful Termination

Gray next contends that the Police Department terminated him because of his race in violation of Title VII.  The city moves for summary judgment on the ground that it had a legitimate non-discriminatory reason for terminating him.  The court finds that summary judgment is not appropriate because Gray's evidence has created a genuine issue for trial as to

whether his race was, at least, a "motivating factor" in the department's decision to terminate him.

Title VII provides that it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). "[A]n unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

Under Title VII, the employee may be awarded a broad array of relief, including "compensatory and punitive damages," he can demonstrate the employer's unlawful intentional discrimination. 42 U.S.C. § 1981a(a)(1). However, when the employer demonstrates that it "would have taken the same action in the

absence of the impermissible motivating factor," the relief is limited. 42 U.S.C. § 2000e-5(g)(2)(B). If the employer can show that it would have taken the "same action" even absent discriminatory animus, the court may grant declaratory relief, some forms of injunctive relief, and attorney's fees and costs demonstrated to be directly attributable to the discrimination claim, but it cannot award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment. Id. "Thus, ... If the employee shows merely that [an impermissible factor] was a motivating factor, he has established liability and thus may be entitled to some relief. Whether the employer has met its 'same action' burden of proof would go to the nature of the relief available." Hall v. Ala. Ass'n of Sch. Bds., 326 F.3d 1157, 1165 (11th Cir. 2003); see also Morgan v. Saehaesung Alabama, Inc., 2014 WL 1239240, at *4 (M.D. Ala. 2014) (Thompson, J.).

30

In considering a claim of discrimination at trial, therefore, the court must go through a two-step assessment.[5]   In the first step, the factfinder determines whether the employee has proved by a preponderance of the evidence that his race was a motivating factor for the employer's decision, even though other factors also motivated the employer.   If the employee has shown this fact by a preponderance of the evidence, liability is established.   The factfinder

---

5. The parties argued their positions on summary judgment in the terms of the burden-shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   McDonnell Douglas provides a helpful heuristic device for establishing liability through circumstantial evidence.   St. Mary's Honor Center v. Hicks, 509 U.S. 502, 521 (1993); see also Herawi v. State of Alabama Dep't of Forensic Sciences, 311 F. Supp. 2d 1335 (M.D. Ala. 2004) (Thompson, J.).   The burden-shifting approach is "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) (internal quotations and citations omitted).   But it is merely one analytic methodology, and it is "is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).

then proceeds to step two of the process.  At step two, the factfinder determines whether the employer has proved by a preponderance of the evidence that it would have taken the same adverse-employment action against the employee even in the absence of the impermissible factor.  See also Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (in order to obtain a mixed-motive jury instruction under Title VII, 42 U.S.C.A. § 2000e-2(m), "a plaintiff need only present sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence, that race ... was a motivating factor for any employment practice"). Here, the court concludes that the evidence is sufficient to go to a factfinder, that is, the jury, to undertake this two-step process.

On the one hand, the evidence could support a conclusion that the city terminated Gray because it reasonably relied on the conclusions of the department's investigation that Gray was involved with

32

an outlaw motorcycle club.  Gray was a high-ranking
police officer, and his actual or perceived involvement
with a group that condones violence could have brought
disrepute to the force or compromised the department's
ability to protect its community.  The evidence thus
supports the city's argument that it fired Gray for an
entirely legitimate reason, or, at least, would have
terminated Gray absent race bias.

On the other hand, however, the evidence also
supports a conclusion that the city wanted to get rid
of Gray because he was black.  There is evidence to
support a finding that racial hostility was pervasive
in attitudes shared by some of Gray's supervisors and
fellow officers.  First, there is evidence in the
record that, throughout his career, Gray was the
subject of racial slurs used by colleagues and heard
them used around him.  Moreover, his supervisor
decorated his office with Confederate memorabilia;
other colleagues were photographed smiling behind a

33

large Confederate flag.  While Confederate memorabilia, including the flag, have historical significance, they have also been used as symbols of racial hostility towards African-Americans and other minorities. A factfinder could find that, at best, the display of such memorabilia in the workplace reflects an insensitivity, if not conscious disregard, for the feelings of all those (black and white) in the workplace, or, at worst, an actual reflection of racial hostility toward the inclusion of African Americans and other minorities in the workplace. In short, a factfinder could find that the Dothan Police Department's workplace environment is not hospitable to equal opportunity for people of all races.

Moreover, Gray's race and his advocacy on behalf of himself and other black officers and community members had been a continual source of conflict throughout his employment.  He had been denied training opportunities and promotions because of his race, and he had to fight

34

to advance in his career almost every step of the way. As it stood, he was the only black supervisor on staff. Construing the evidence most favorably to Gray, a factfinder could find that the city used the assault at the Outcast clubhouse as an opportunity to seek out information on Gray that could justify his termination, and his unusually long suspension provided the city enough time to dig up dirt. Indeed, Gray contends that it offered lenience to criminal suspects in exchange for information that could hurt Gray.

That race discrimination was, at least, in play at the time of his discharge is a reasonable inference. Moreover, given that Gray's termination came on the heels of a management shuffle which transferred his supervisory authority to a white officer; that he ultimately was replaced by a white officer; and that it has not fired any other officers for their association with motorcycle clubs, the evidence could also support the conclusion that Gray's race was not only a

'motivating' factor in his termination, it was the only factor.

Whether the first conclusion (no discrimination) or the second (discrimination, in whole or in part) is correct cannot be resolved on summary judgment. Rather, because the evidence has presented a "convincing mosaic of circumstantial evidence that would allow the jury to infer intentional discrimination," it will go to trial. <u>Smith v. Lockheed-Martin Corp.</u>, 644 F.3d 1321, 1328 (11th Cir. 2011).

### 3. Racially Hostile-Work Environment

Reading Gray's complaint broadly, as is required will, the court evaluates Gray's allegations of a racially hostile-work environment. To establish the claim here, Gray must show: (1) that he belongs to a protected racial group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have

been based on his race; (4) that the harassment was
sufficiently severe or pervasive to alter the terms and
conditions of employment and create a discriminatorily
abusive working environment; and (5) that his employer
is responsible for such environment under either a
theory of vicarious or of direct liability. See Miller
v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th
Cir. 2002) (applying these factors to a national-origin
claim).

A hostile-work environment claim is an allegation
that "the workplace is permeated with discriminatory
intimidation, ridicule, and insult, that is
sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an
abusive working environment." Harris v. Forklift Sys.
Inc., 510 U.S. 17, 21 (1993). As discussed above, the
"very nature [of a hostile-environment claim] involves
repeated conduct," and liability is based on the
"cumulative effect of individual acts." Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). When a hostile-environment claim involves discriminatory conduct that occurred before the statutory filing period, the claim is actionable only if some portion of the claim continued into the limitations time period. Id. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."); see also Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) ("Put simply, if the smallest portion of that 'practice' occurred within the limitations time period, then the court should consider it as a whole.").

Here, Gray claims that he was subjected to racial harassment throughout his career. Of course, untimely evidence of harassment may be considered as part of his hostile-environment claim only if it contributed to the same unlawful employment practice that continued into

38

the limitations period--that is, if it contributed to the same environment of discriminatory intimidation, ridicule, and insult that Gray experienced within 180 days of filing his EEOC charge.

To determine whether pre- and post-limitations period conduct is part of the same unlawful employment practice, the Supreme Court advises looking to whether the incidents involved "the same type of employment actions," the frequency of the conduct, and who perpetrated the acts. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002). Here, during the post-limitations period, Gray's allegations of racial harassment include having his supervisory capacity nitpicked by his supervisor, Parrish; being reviewed critically by Parrish on the internal-communications system; being treated differently than his fellow white officers by Parrish; and being exposed by Parrish to an office culture that set pro-Confederacy viewpoints on proud display. Additionally, Gray's direct supervisory

authority was transferred to a lower-ranked white officer. Prior to the limitations period, Gray alleged similar conduct by Parrish: Parrish scrutinized Gray's supervisory style and diligence; humiliated Gray by questioning his whereabouts to others and posting his transfer publicly; lodged critical reviews against Gray and failed to praise him equally to other officers; and put Gray on a Performance Improvement Plan. Gray was also transferred from Field Operations to Administrative Services, a less prestigious position.

Because Gray alleges that the post-limitations-period racial harassment was perpetrated primarily by Parrish and because Gray has alleged no material difference between the type or frequency of Parrish's harassing conduct before or after the limitations period, the court finds that the same allegedly hostile environment existed at Gray's workplace <u>at least</u> from the time when Parrish became

Gray's supervisor--that is, 2010.[6]  In other words, for the purposes of timeliness, the court considers relevant any alleged harassment that occurred while Parrish was Gray's supervisor.

The city's defense to Gray's racial hostile-environment claim primarily concerns whether untimely instances of alleged racial harassment throughout Gray's career can be considered under the statute of limitations.  As such, the City does not dispute the various elements of Gray's prima-facie case on this claim, and it does not address head-on whether Parrish's history of harassing conduct towards Gray was

---

6. The court does not opine on whether a hostile environment also existed prior to 2010.  Because Gray's evidence of a racially hostile environment within the filing period primarily concerns harassment by Parrish, as described above, the court looks only to evidence of that <u>same</u> environment prior in conduct preceding the filing period.

sufficient to create an actionable hostile-work environment <u>on the basis of race</u>.[7]

_____

    7. The city's failure to brief the elements of Gray's hostile-environment claim seems to arise from confusion as to Gray's theories of recovery. In its first summary-judgment motion, the city argued that Gray did not properly state a racially hostile-environment claim. <u>See</u> Def. Motion (doc. no. 34) at 11 ("Count I does not state a claim for hostile work environment...."). As such, at this stage, its arguments were responsive to only Gray's claim of <u>retaliatory</u> hostile-environment.

    Indeed, Gray did not plead racial harassment as a separate count in his complaint; rather, he subsumed his evidence of harassment into a count he titled "Race Discrimination: Title VII." Complaint (doc. no. 1) at 10. But the facts alleged in that count pertain both to discrete acts of discrimination and repeatedly harassing conduct--the foundation of a hostile-environment claim. And his complaint explains several times that he brings claims of "discrimination, harassment, and retaliation." <u>See</u> <u>id</u>. at 1, 2, 9. As Gray himself admits, the complaint was not a "model of clarity." <u>See</u> <u>McCurdy v. Auburn University</u>, 2015 WL 2064248, at *4 (M.D. Ala. 2015) (Thompson, J.). But it was enough to put the city on notice.

    To the extent that any ambiguity remained as to whether Gray's hostile-work environment claims were based on theories of both racial harassment <u>and</u> retaliation, Gray's summary-judgment briefing delineated his several theories of recovery. <u>See</u> Plf. Resp. Br. (doc. no. 48) at 68 ("Gray's Title VII claims include discrimination, harassment, and retaliatory

The city does assert a thorough defense to Gray's evidence of a <u>retaliatory</u> hostile-work environment (which includes the investigation of his motorcycle associations and the other events leading up to his termination).   The relevance of that argument is somewhat limited here, because the alleged cause of the each hostile environment is obviously not the same: harassment due to Gray's race, or due to his EEOC charges and other complaints of race-based discrimination?   But to the extent that the city analyzes Parrish's harassing conduct as part of the <u>retaliatory</u> hostile-environment claim, the court notes that its argument is not responsive to Gray's

hostile environment....   Defendant erroneously argues that Count I does not state a claim for harassment under Title VII....  Despite the header's use of the term 'discrimination,' the Complaint provides Defendant with more than adequate notice of a Title VII harassment claim....").

Yet even after this clarification, the city's reply briefing on summary judgment still failed to address Gray's <u>racial</u> harassment claim on the merits.   Rather, its argument about Gray's racially hostile-environment claim rests entirely on timeliness.

prima-facie case. Indeed, its recasting of Gray's allegations as "a few examples of Plaintiff's supervisor checking in on him or correcting him" that could not constitute "harassment" because they served a "legitimate purpose" is simply not in line with the meaning of harassment under Title VII. Def. Sum. J. Br. (doc. no. 39) at 71, 64; see Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982) (explaining, in a context of a sexual harassment case, that conduct constitutes harassment when it has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment").

Construing the evidence in the light most favorable to Gray, the court finds that there is, at least, a genuine dispute of material fact as to whether Gray suffered harassment based on his race sufficient to impose liability under Title VII. Indeed, the court finds sufficient evidence to substantiate Gray's

hostile-environment claim even considering only Parrish's conduct towards Gray during the period that he was his supervisor, and even excluding any of Gray's allegations that might amount to "discrete" acts of discrimination.

Therefore, summary judgment will be denied on Gray's racially hostile-work environment claim.

### 4. Retaliatory Hostile-Work Environment

The Eleventh Circuit Court of Appeals recognizes a retaliatory hostile-environment claim when, as a result of the employee's opposition to an unlawful employment practice or participation in EEOC proceedings, "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   Gowski v. Peake, 682

F.3d 1299, 1311 (11th Cir. 2012).[8]  The city does not dispute that Gray engaged in protected activity by both complaining about race-discrimination throughout his tenure and filing the EEOC charge that gave rise to this case.[9]

---

8.  This cause of action was only recently recognized in this circuit, see Gowski v. Peake, 682 F.3d 1299 (11th Cir. 2012), though some unpublished cases issued since Gowski offer guidance as to the elements of the claim that the court will look to here. A plaintiff establishes a prima facie case of a retaliatory harassment by demonstrating (1) he engaged in protected activity; (2) after doing so, he was subjected to unwelcome harassment; (3) his protected activity was a "but for" cause of the harassment; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment; and (5) a basis exists for holding her employer liable either directly or vicariously. Swindle v. Jefferson Cnty. Comm'n, 593 F. App'x 919, 929 n.10 (11th Cir. 2014).

9.  Gray also contends that he was subject to a retaliatory hostile environment following his complaints about the department's discriminatory treatment of minority citizens.  Whether this is an example of race discrimination towards community members, it is not an example of retaliation under Title VII.  Title VII's retaliation clause protects employees who oppose unlawful discrimination practices in employment, not unlawful discrimination generally.

Gray's hostile-environment claim describes both discrete acts that could be actionable and retaliatory harassment that would not rise to the discrete level. Both, he contends, were of the same type of intimidation, ridicule, and insult giving rise to a retaliatory hostile environment. <u>Cf</u>. <u>Chambless v. Louisiana-Pac. Corp.</u>, 481 F.3d 1345, 1350 (11th Cir. 2007) (explaining that the "pivotal question is whether the timely discrete acts are sufficiently related to the hostile work environment claim"). His theory of liability is consistent with the court's discussion of discrete acts above, and with Eleventh Circuit precedent holding that, while "[d]iscrete acts cannot alone form the <u>basis</u> of a hostile work environment claim," a jury can "<u>consider</u> discrete acts as part of a hostile work environment claim." <u>Gowski v. Peake</u>, 682 F.3d 1299, 1313 (11th Cir. 2012) (emphasis in original).

47

Gray's claim focuses on the environment that arose after he began to voice concerns about the city's targeting and treatment of minority citizens in December 2012.[10]   Shortly thereafter, Gray was transferred from Field Operations to a less prestigious position in Administrative Services with less supervisory authority.   Following this transfer, Gray complained directly to Parrish, who reported it to Benton.   He also complained to Departmental EEO Officer Mathews about his belief that the transfer was motivated by race discrimination.   Mathews told him his complaint had to wait until another officer's race-discrimination claim had been resolved.

As stated, in May 2013, a lower-ranked white officer, Etress, was transferred to Administrative

_____

10. As discussed in the preceding footnote, the court does not consider Gray's opposition to the police department's treatment of community members as protected Title VII activity.   However, because Gray made informal and formal complaints of race discrimination both before and immediately after his transfer, there is no question that Gray participated in protected activity sufficient to plead retaliation.

Services, and direct supervision over Gray's staff--approximately 60 employees--was reassigned to Etress and Parrish; Gray now supervised only Etress and the department's only black secretary. Gray alleges that, after the transfer, he had little actual supervisory authority even over Etress. Parrish repeatedly warned Gray not to "micromanage" Etress, and that he was being "watched." In June 2013, in response to a critical performance review from Parrish, Gray complained that Parrish was discriminating against him on the basis of his race, and, the next day, he forwarded his complaint to his personnel director. Gray filed an EEOC charge in August 2013 on the same basis.

Three weeks after Gray filed his EEOC charge, there was an assault at the Outcast clubhouse. The investigating officers specifically sought out information that could harm Gray's employment with the department, though Gray had nothing to do with the

49

assault.   This was followed by intense interrogations of Gray and an extended suspension; Gray describes this conduct as a "witch hunt."   After the four-week investigatory period, Gray was terminated.

The city argues that the internal-affairs investigation, Gray's administrative leave, and his termination are all justified by legitimate, non-discriminatory reasons; they contend, therefore, that no act alleged as retaliatory by Gray can be considered "harassment."   But whether the city in fact was motivated by legitimate reasons, or discriminatory or retaliatory reasons--or perhaps a mix of both or all--remains in dispute.   As such, it is now a question of fact for the jury.

While retaliatory intent must be the "but-for" cause of retaliation to maintain an individual retaliation claim, see Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013), the Eleventh Circuit has held that a retaliatory hostile environment can

survive on a mixed-motive theory.  See Gowski v. Peake,
682 F.3d 1299, 1313 (11th Cir. 2012) ("[T]he jury here
found that the discrete acts were motivated in part by
retaliatory animus.  Although that may be sufficient
under the same-decision defense to preclude liability
for each of the acts individually, it is not enough to
eliminate liability for the hostile environment caused
by the retaliatory animus when the discrete and
non-discrete acts are taken collectively.").  As the
appellate court explained in Gowski, "the but-for
causation that matters in a retaliatory hostile work
environment claim" is "the severe and pervasive
accumulation of actions that would not have occurred
but-for the retaliatory reason, even if each action
alone was justifiable." Id. (emphasis added).

    In other words, there are two relevant questions
here.  First, but for the city's underlying retaliatory
intent, would Gray's environment have been made
hostile?  Second, if so, did the city's retaliatory

animus cause an accumulation of actions--independently legitimate or not--that was sufficiently severe or pervasive to alter the terms or conditions of Gray's employment?

The court finds that Gray has presented enough evidence to reach the jury on this claim. Even discounting the weight of the discrete acts, Gray's allegations of retaliatory harassment, based on Parrish's supervision and the alleged "witch hunt," is arguably sufficient to meet his prima-facie burden.

First, Gray has established a genuine dispute of material fact about the city's retaliatory intent and the cause of the hostile environment. Gray's evidence of retaliatory animus is the increasing escalation of adverse actions taken against him and harassing conduct directed at him after his repeated complaints, and the close temporal proximity between his EEOC charge and the "witch hunt" that led to his termination. The city argues, in response, that, because Gray complained

52

about race discrimination throughout his employment yet rose in the ranks regardless, it is not believable that his more recent complaints "suddenly" caused a retaliatory hostile environment.

The city misses the mark.  Whether a retaliatory work environment had previously existed as a result of Gray's past complaints, and whether Gray could advance in his career despite a hostile environment, has no bearing on whether retaliatory animus of his supervisors and colleagues in response to these more recent complaints created a hostile environment that is actionable now.  And it certainly does not make it less believable that Gray's more recent complaints could have been the last straw.

Gray also shows a causal connection by looking to the close temporal proximity between his EEOC charge and the initiation of the investigation that sparked his termination.  Gray was placed on administrative leave three weeks after he filed his EEOC charge, and

terminated four weeks after that. "Mere temporal proximity, without more, must be 'very close'" to demonstrate causation. <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)) (holding that three to four months between the statutorily protected expression and an adverse employment action is insufficient to suggest causality). While Gray's evidence of temporal proximity does not stand alone as his only causation evidence, the court finds that this span of time is <u>close enough</u> to "very close" to present a question to the jury. <u>Cf</u>. <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks between filing of EEOC charge and termination is "sufficiently proximate to create a causal nexus for purposes of establishing a prima facie case.").

The city responds that it could not control the date of the assault at the Outcast clubhouse and that

its suspension and termination ultimately were based only on information it did not learn about until after he had filed his charge. But it is difficult to get around the fact that <u>shortly after</u> Gray filed his EEOC charge, the department took a new interest in investigating Gray's motorcycle-club affiliations, despite longstanding knowledge of his involvement with the Bama Boyz. Indeed, the city had even accepted money from the group in the past. Moreover, the city's reliance on case law holding that an intervening event can break the causal chain is inapposite: Gray did not fail to meet performance standards or engage in any intervening act of misconduct between filing his charge and his termination. <u>Cf</u>. <u>Fleming v. Boeing, Co.</u>, 120 F.3d 242, 248 (11th Cir. 1997); <u>Hankins v. AirTran Airways, Inc.</u>, 237 F. App'x 513, 520-21 (11th Cir. 2007). Rather, the city chose to investigate Gray's longstanding involvement with area motorcycle clubs, and determined that his social affiliations were in

conflict with his police duties, after he filed his charge.

Second, the actions that Gray alleges to be retaliatory were sufficiently severe or pervasive to alter the terms and conditions of Gray's employment. The severe or pervasive requirement contains both an objective and a subjective component; "to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjective perceives to be abusive." Gowski, 682 F.3d at 1312. To determine if conduct is objectively severe or pervasive, courts look to the totality of the circumstances, analyzing "the frequency of the conduct"; "the severity of the conduct"; "whether the conduct is physically threatening or humiliating, or a mere offensive utterance"; and "whether the conduct unreasonably interferes with the employee's job performance." Id.

Here, discrete acts certainly played a role in creating an environment of intimidation after Gray's more recent complaints: his direct supervisory authority over 60 staff was removed and given to a lower-ranked white officer; he was suspended; and he was ultimately terminated. And the evidence also supports a conclusion that smaller acts of retaliatory harassment, ridicule and insult altered the terms and conditions of Gray's work environment on their own. Gray's transfer to a less prestigious position was posted publicly; his supervision over inferior officers was nitpicked and chastised; and he was interrogated for hours by armed colleagues during the course of an internal affairs investigation. Finally, given his statements to the court, there is no question that Gray subjectively perceived the environment to be abusive. Therefore, because the court finds that a reasonably jury could find such an environment to be objectively

57

and subjectively abusive, this claim survives summary judgment.

## B. First Amendment Claim

Gray next alleges that the City violated his First Amendment right to free association.[11]  The First Amendment guarantees to individuals the freedom to associate both for the purely private purpose of forming and preserving personal and social relationships, and as a collective means of engaging in political expression, religious worship, or other activities independently protected by the Constitution. See Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984); Green v. City of Montgomery, 792 F. Supp. 1238, 1252 (M.D. Ala. 1992) (Thompson, J.).

_____

11.  Though Gray does not specify the statutory vehicle through which he pleads his First Amendment claim, the city interpreted his claim under 42 U.S.C. § 1983, and Gray did not object.  As such, the court assumes, as did the city, that Gray has plead under § 1983.

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," though "public employees do not surrender all their First Amendment rights by reason of their employment." Garcetti v. Ceballos, 547 U.S. 410, 418, 417 (2006).  A governmental body "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Akins v. Fulton County, Ga., 420 F.3d 1293, 1303 (11th Cir. 2005).  As such, if a public employee demonstrates that his associational activity was a substantial or motivating factor for an adverse employment action, the employer may avoid liability for a First Amendment violation only by proving either that the government's interest as an employer in the efficient operation of the workplace supports the challenged action or that it would have reached the same decision even the absence of the employee's associational activities.  See Vila v. Padron, 484 F.3d

1334, 1339 (11th Cir. 2007) (setting forth a
four-factor test to determine whether public employee
has been discharged in retaliation for speech protected
under the First Amendment); <u>Hatcher v. Board of Public
Education and Orphanage</u>, 809 F.2d 1546, 1558 (11th Cir.
1987) (holding that employee need not demonstrate that
his speech pertained to a matter of public concern in
the context of a free-association claim); <u>see also
Green</u>, 792 F. Supp. at 1252. In this case, because the
city does not dispute that Gray's motorcycle-club
affiliation was a substantial or motivating factor for
Gray's termination, the court will begin by analyzing
the government's interest as an employer.

Gray contends that he was terminated based on his
affiliation with the Bama Boyz. He argues that his
association with Bama Boyz should be entitled to
constitutional protection under the Supreme Court's
<u>Pickering</u> test, which balances a public employee's
right to engage in speech or association against the

interest of the employer in "promoting the efficiency
of the public services it performs." Pickering v.
Board of Education, 391 U.S. 563 (1968); see also
Shahar v. Bowers, 114 F.3d 1097 1112-1113 (11th Cir.
1997) (applying the Pickering balancing test to
question of First Amendment right to freedom of
association).

The city argues, in response, that its termination
was justified under Pickering. Though the city
presents no evidence that Gray's Bama Boyz club
identified as an outlaw club or engaged in any criminal
or nefarious activity itself, the city alleges that, as
member and president of Bama Boyz, Gray developed and
maintained affiliations with outlaw clubs and their
members that could bring disrepute to the department
and compromise police work.

Under the reasoning of Shahar, an employer need not
show actual disruption or make a "particularized
showing of interference with the provision of public

61

services" in order to have its concerns regarding an employee's association with unpopular groups weighed by the court.  Id. at 1108; see also Connick, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").  Rather, the employer need only present evidence that it made a "reasonable prediction[] of disruption."  Id. at 1124.  Moreover, because it recognizes that "in the context of law enforcement, there is a special need to employ persons who act with good judgment and avoid potential conflicts of interest," Ross v. Clayton County, Georgia, 173 F.3d 1305, 1311 (11th Cir. 1999), the Court of Appeals has held that a police department may be afforded "more latitude in responding to the speech of its officers than other government employers." Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000).  With

this law-enforcement-specific standard in mind, the court will turn to the scales.

The _Pickering_ balancing test is designed to ensure that public employees' exercise of their free-speech rights as citizens does not substantially impede public employers from maintaining "efficiency and integrity in the discharge of official duties, and ... proper discipline in the public service," _Connick_, 461 U.S. at 150–51, (quoting _Ex parte Curtis_, 106 U.S. 371, 373 (1882)); _see also_ _Hartwell v. City of Montgomery,_ 487 F. Supp. 2d 1313, 1326 (M.D. Ala. 2007). Under this standard, a public employer need not accommodate the free-speech interests of an employee if doing so entails a complete breakdown in workplace morale, substantially inhibits the effective delivery of public services, or disrupts other important aspects of normal business operations. Here, the court concludes that under the circumstances presented and in light of the extreme deference given by the Eleventh Circuit to

law-enforcement    agencies    in    restricting    the
associational privileges of their employees, the city's
interests  as  employer  outweighs  Gray's  interest  as
citizen.

As  discussed  above,  though  Gray  contacted  leaders
of  several  outlaw  motorcycle  clubs  to  receive  their
"blessing"  and  ensure  that  his  own  group  could  ride
safely  through  claimed  territory,  the  department's
investigation  focused  primarily  on  Gray's  contacts  with
Outcast, a known outlaw motorcycle club.  Gray admitted
to  attending  some  events  at  the  Outcast  clubhouse;  to
being  friendly  with  Outcast  club  members  at  various
charity  events;  and  to  receiving  patches  for
distribution  among  the  Bama  Boyz  in  memory  of  an
Outcast member who had passed away.  The president of
the  local  Outcast  chapter  also  stated  that  he  had
conversations with Gray about ongoing Police Department
investigations of his group, though Gray denied this.

The court finds that the City's interest in prohibiting its police officers from cultivating and maintaining such contacts outweighs Gray's interest in free association in light of two strands of precedent, one within the Eleventh Circuit dealing with the law-enforcement setting more generally, and one from other circuits dealing with cases with facts closely aligned to those at issue here.

First, within the Eleventh Circuit, the appellate court gives much weight to the interests of a police department in "avoiding potential conflicts of interest between loyalty to the law enforcement employer and loyalty to someone in an off-duty, personal relationship." Ross, 173 F.3d at 1311 (holding that county did not violate correctional officer's First Amendment free-association rights when it demoted him for "conduct unbecoming an officer" after learning that he was living with his brother, an active probationer, without permission); see also McCabe v. Sharrett, 12

F.3d 1558, 1572 (11th Cir. 1994) (holding that transfer of police chief's secretary based on her marriage to an officer under the police chief's command did not violate her free-association rights because the police chief's concern that the "marriage would undermine her loyalty to him and thus the confidentiality of his office was reasonable and not merely subjective"). As such, to the extent that Gray's contacts with Outcast members--whether socially or in a law-enforcement capacity--could compromise his loyalty to police-department objectives, Eleventh Circuit precedent would lead to the conclusion that the city's interest as an employer outweighs Gray's First Amendment rights.

Several cases outside of the Eleventh Circuit articulate the various conflicts of interest that might arise when law-enforcement officers associate with people involved in outlaw motorcycle clubs. For example, the Second Circuit Court of Appeals has held

66

that the discipline or termination of three correctional officers for their association as members or prospects of a one-percenter motorcycle club, the Outlaws, did not violate their free-association rights. <u>Piscottano v. Murphy</u>, 511 F.3d 247, 276 (2nd Cir. 2007). In that case, after an internal investigation, the Department of Corrections had "arrived at a good-faith conclusion that having correctional officers who are associated with the Outlaws is detrimental and reflects negatively on [the department]." <u>Piscottano</u>, 511 F.3d at 276. The Second Circuit found no First Amendment violation, crediting the department's concerns that, among other factors: the plaintiffs' association with the Outlaws could interfere with its collaboration with other law enforcement agencies, including gang-activity task forces; that the department "has an interest in avoiding <u>even the appearance</u> that its correctional officers have conflicts of interest" and that the acceptance of

favors raises the prospect that favors will be returned and creates an appearance of a potential conflict of interest; and that various rivalries between different clubs could give rise to plausible claims of bias. Id. at 277 (emphasis added).

Similarly, in Turner v. United States Capital Police, a former police officer asserted a First Amendment free-association claim after he was terminated for associating socially with members of outlaw motorcycle clubs and other convicted felons. 34 F. Supp. 3d 124 (D.D.C. 2014) (Jackson, J.). As the court described, the plaintiff's termination was based on his "encounter with a founding member of the Hell's Angel's[, an outlaw motorcycle club], plaintiff's visit to the clubhouse of a Hell's Angels chapter, plaintiff's presence and alleged interactions with the members of outlaw motorcycle clubs at certain events, photographs of plaintiff at outlaw motorcycle club clubhouses and with convicted felons, and plaintiff's

alleged association with at least one white supremacist," even though the plaintiff contended that "some of these alleged incidents were mischaracterized and others never occurred at all." Id. at 131. The district court denied his claim, finding that, because the plaintiff was "not only a sworn law enforcement officer, but also a supervisor of other officers," "[h]is multiple encounters with outlaw organizations and individuals could reasonably be expected to reflect poorly on the Capital Police and to impair harmony among coworkers, and to interfere with the regular operation of the enterprise." Id.

Certainly, the facts against the plaintiff in this case are not as striking as those in either Piscottano or Turner. Unlike the plaintiffs in Piscottano, Gray was not a member or prospect of an outlaw or one-percenter club; rather, Gray's association with any outlaw group or its members was infrequent and attenuated at best. And to the extent that his

69

"blessings" created any formal affiliation with outlaw clubs, he seems to have sought them to <u>avoid</u> conflict with outlaws, not to ally with them.  Unlike the clubs at issue in <u>Turner</u>, there is no evidence in the record that Outcast was engaged in any sophisticated criminal enterprise, though Gray knew it to be an outlaw group and knew that it had the potential for violence-- indeed, a criminal assault at the clubhouse set off the investigation at issue here.

But even <u>potential</u> conflicts of interest within a law-enforcement agency can cause an officer's First Amendment associational rights to give way to the agency's interests in ensuring loyalty to law-enforcement goals, because of a "heightened need for order, loyalty, morale and harmony" among law-enforcement officers.  <u>Oladeinde v. City of Birmingham</u>, 230 F.3d 1275, 1293 (11th Cir. 2000).  And the law is clear that those conflicts do not need to manifest into actual disruption before they can weigh

70

into the <u>Pickering</u> analysis.  <u>See</u> <u>Connick</u>, 461 U.S. at 152.  In such a context, the court finds that the city's interest outweighs Gray's.

Therefore, the court will enter summary judgment on Gray's First Amendment claim.


### C. Consent-Decree Claim

Finally, Gray alleges that by discriminating against him on the basis of race, the city violated the terms of a longstanding consent decree.

In a 1974 voter-dilution case, after finding that "there has been and still remains a substantial and pervasive racial discrimination in Dothan"; that "governmental services have been disproportionately bad in the black areas"; and that the city had exhibited "a clear lack of responsiveness to the physical needs of its black citizens," this court issued an order enjoining the City of Dothan "from operating the City government in a manner which denies to the black

citizens of Dothan ... their right to equal treatment in the provision of governmental services" and imposing "an affirmative duty to provide blacks with their proportionate share of government services ... in order to remedy the effects of past denial to blacks of access to the political process."  See Williams v. City of Dothan, 818 F.2d 755, 756, 760-61 (11th Cir. 1987) (discussing and quoting Yelverton v. Driggers, 370 F. Supp. 612 (M.D. Ala. 1974) (Johnson, J.) and Yelverton v. Driggers, No. 1305-S (unpublished companion order issued February 7, 1974) (M.D. Ala. 1974) (Johnson, J.)).

In 1976, in a separate case challenging discriminatory employment practices in the City of Dothan, this court incorporated the "affirmative action plan" developed for the Yelverton case into a consent decree in the employment case.  Wiggins v. Hollis, No. 75-57-S (M.D. Ala. Feb. 13, 1976) (Johnson, J.).  After plaintiffs presented evidence that black employees and

applicants were being discriminated against by the city
on the basis of race in the city's recruiting, hiring,
promoting, assigning, and testing practices, the court
permanently enjoined the city from discriminating on
the basis of race against the named plaintiffs and the
members of the class they represent.  Id.  The court
also imposed certain affirmative duties on the city to
remedy discriminatory practices.  Id.; cf. Matthews v.
City of Dothan, 2006 WL 3742237 (M.D. Ala. 2006)
(Watkins, J.) (referencing ongoing consent decree in
Dothan).[12]

Gray argues that because the city discriminated on
the basis of race against him, it has violated its
continuing obligations under the Wiggins consent
decree.  He asks the court to hold the city in contempt
of the court's decree; to resume court monitoring of
adherence to the consent decree; to enjoin any further

12.  Both parties agree that the City of Dothan
remains under the obligation of the Wiggins consent
decree.

violations; and to provide other injunctive relief and damages specific to his circumstances.

Gray attempts to invoke the consent decree simply for the general proposition that the city should not violate the law.  The consent decree provides nothing that is all ready not covered by Title VII.  There is no need to invoke the consent decree here.

\*  \*  \*

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE the court as follows:

(1) Defendant City of Dothan's motions for summary judgment (doc. nos. 34 & 39) are granted with respect to following claims by plaintiff Ivan "Keith" Gray: First Amendment claim, consent decree claim, Title VII claim of race discrimination based transfer of supervisory authority.

(2) Said motions are denied as to all other claims.

DONE, this the 22nd day of June, 2015.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

74